**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVE GONZALEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 4557 |
| | ) | |
| BRANDENBURG INDUSTRIAL | ) | Judge Rebecca R. Pallmeyer |
| SERVICE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Steve Gonzalez was employed by Defendant Brandenburg Industrial Service Company (hereinafter, "Brandenburg") as an operating engineer. From the fall of 2003 until the spring of 2004, on a number of occasions outlined below, Brandenburg Superintendent Ronnie Freeman ordered Gonzalez to perform manual labor while using coarse language allegedly laced with references to Gonzalez's Mexican national origin. Plaintiff sued Brandenburg for creating a hostile work environment and discriminating against him on the basis of his national origin in the terms and conditions of his employment in violation of Title VII and 42 U.S.C. § 1981. Defendant now moves for summary judgment on all claims.

For the reasons set out below, Defendant's motion is denied.

## STATEMENT OF FACTS[1]

Plaintiff, a U.S. citizen, was born in Mexico. (Def.'s 56.1(a) ¶ 2.) In 1982, Plaintiff took a position as a laborer with Brandenburg, a demolition business whose laborers use blowtorches, shovels, jackhammers, wrecking bars, and brooms to tear down and carry away debris from buildings, roads, and other construction projects. (*Id.* ¶¶ 1,3; Gonzalez Dep. at 16-17.) Plaintiff remained with Brandenburg as a laborer for twelve years, at which time he relocated to Alabama

---

[1] The facts are presented in the parties' statements pursuant to Local Rule 56.1. Defendant's Statement of Undisputed Material Facts is cited as "Def.'s 56.1(a) ¶ __"; Plaintiff's Response is cited as "Plaintiff's Response ¶ __"; Plaintiff's Statement of Additional Facts is cited as "Pltf.'s 56.1(b)(3)(B) ¶ __"; and Defendant's Response is cited as "Def.'s Response ¶ __".

to take a job as a foreman. (Def.'s 56.1(a) ¶¶ 8-10.) Plaintiff recalled that during this first period of employment at Brandenburg, while laborers occasionally operated some of the machinery, such as the bobcats, Plaintiff never saw an operating engineer perform manual labor. (Gonzalez Dep. at 20-21.)

Upon Plaintiff's return to Illinois in 1998, U.S. Dismantlement employed Plaintiff as an operating engineer and Plaintiff joined the International Union of Operating Engineers, Local 150. (*Id.* at 26-27.) In October of 2000, the union sent Plaintiff back to Brandenburg, where Jack Jasinowski hired him as an operating engineer. (Def.'s 56.1(a) ¶¶ 11-12.) Brandenburg's workforce is overwhelmingly Hispanic, and Superintendent Freeman estimated that 99 percent of the employees he supervised there are Mexican or Mexican-American. (*Id.* ¶ 32; Plaintiff's Response ¶ 32; Freeman Dep. at 29.) Although the record lacks specific dates for many events, Plaintiff alleges that Freeman began harassing and discriminating against him within days of his return. (Gonzalez Dep. at 190.) As the superintendent, Freeman answered only to Brandenburg Project Manager Dennis McGarel and was usually the senior-most manager on any Brandenburg work site. (Pltf.'s 56.1(b)(3)(B) ¶¶ 17-21.) Plaintiff testified that he worked with Freeman 90 percent of the time, (Gonzalez Dep. at 209), while Freeman himself could recall only four or five occasions. (Freeman Dep. at 28.) As set forth below, Plaintiff elaborated on nine interactions in his deposition.

**Asbestos Removal Projects**

In the fall of 2003, Plaintiff had been working for Brandenburg at a job on Wacker Drive. (Gonzalez Dep. at 32.) Although there was equipment at the work site, Plaintiff was not assigned to run that machinery. (Def.'s 56.1(a) ¶ 63.) Instead, a supervisor named Louie directed Plaintiff to perform manual removal of asbestos. (Gonzalez Dep. at 32.)[2] To Plaintiff's dismay, while he performed what he considered to be laborer's work, some of the laborers themselves were

---

[2]     Neither Louie's last name nor his national origin appear in the record.

operating the machines. (*Id.*) Plaintiff acknowledges that Louie said nothing offensive to him and that the laborers performing what Plaintiff considered to be operator's work were themselves Mexican or Mexican-American.[3] (Def.'s 56.1(a) ¶ 65.) Plaintiff called Kevin Burke, Local 150's business agent, to complain about the way Brandenburg assigned work at the Wacker Drive site. (Gonzalez Dep. at 27-29.) According to Plaintiff, Burke promised to send another business agent to the work site, but no one came. (*Id.* at 31.)

Plaintiff asserts that Brandenburg (Plaintiff does not identify the particular supervisor) then sent him offsite for two weeks to perform additional asbestos removal at an unidentified building. (Def.'s 56.1(a) ¶ 66.) When Plaintiff first arrived at this new work site, Plaintiff recalled that Freeman told Tony Scott, one of the Brandenburg foremen, "[P]ut this fucking Mexican in the basement and take the asbestos out." (Gonzalez Dep. at 51.) Plaintiff testified that in his twenty-two years in construction he had never heard a foreman or superintendent swear at an employee he or she was supervising. (*Id.* at 57-58.) Plaintiff further stated that Freeman never used this abusive language with any other employees, regardless of their national origin. (Def.'s 56.1(a) ¶¶ 34-35.) Yet, according to Plaintiff, on almost every shift in which Freeman and Plaintiff worked together, Freeman used similar abusive language in reference to Plaintiff's national origin:

> When I come back to Brandenburg since I been operator, he was talking to me like that all the time. Fucking jagoff. Fucking Mexican. Motherfucker. Put this motherfucker to work over there. . . . Put this Mexican over here. Every fucking day I hear this, the fucking word from him.

(Def.'s 56.1(a) ¶ 31; Gonzalez Dep. at 58-59.)

Although Plaintiff was assigned to perform manual labor at this worksite, he observed two bobcats[4] and inferred from this that there was machine operation work to be done. (Gonzalez Dep. at 54.) When Plaintiff complained about his assignment to another foreman on the site, Willie

---

[3] Both parties use the term "Spanish" to refer to people of Mexican national origin. (Gonzalez Dep. at 30-31.)

[4] "Bobcat" appears to be a generic term for a small, four-wheeled construction vehicle, often with a forklift or shovel attached to the front.

Gonzalez, Gonzalez told Plaintiff that if he did not remove the floor tiles as instructed, Freeman would fire him. (*Id.* at 46-48.) Plaintiff did not in fact remove the tiles, however. (*Id.* at 50.) Instead, he proceeded to put plastic over windows (presumably, to prevent them from being damaged while other laborers removed the floor tiles and pulled out the asbestos). (*Id.*) With respect to the two machines Plaintiff observed, Wele Hernandez, a Mexican or Mexican-American operating engineer, operated one of the bobcats for the duration of the job, (Def.'s 56.1(a) ¶ 68), and Plaintiff could not recall the name or national origin of the man who operated the other one. At some point during this two-week job, Plaintiff himself operated the second bobcat for two days. (Gonzalez Dep. at 38-40.)

Although Brandenburg supervisors assigned Plaintiff manual tasks rather than asking him to operate the machinery on site, Plaintiff received an operator's wage for work at both sites. (*Id.* at 36, 50.)

**Whiting, Indiana Project**

Plaintiff's next Brandenburg assignment was to a work site in Whiting, Indiana, where Tony Evans was the foreman. (Def.'s 56.1(a) ¶ 69; Gonzalez Dep. at 64.) Plaintiff believed that he was being sent to operate a piece of machinery, but when he arrived, Plaintiff heard Freeman tell Evans, "Put this fucking Mexican on the torch upstairs." (Gonzalez Dep. at 64.)

Plaintiff observed that while Freeman assigned him to manual labor, two operators and two laborers were operating the machines at the work site. (*Id.* at 66.) At least one of these operators, Jaime Sapian, was Mexican or Mexican-American. (Def.'s 56.1(a) ¶ 71.) Plaintiff refused to perform the task assigned to him, and Evans assigned Plaintiff to one of the machines after Freeman left the work site. (Gonzalez Dep. at 67, 76.)

**O'Hare Project**

From Whiting, Plaintiff rotated through several Brandenburg jobs. (Gonzalez Dep. at 77.) One work site was O'Hare Airport. (Def.'s 56.1(a) ¶ 72.) The foreman on that job, Tony Carbajol,

was Mexican or Mexican-American. (Gonzalez Dep. at 82.) Plaintiff, along with three persons of Mexican descent–Wbaldo Juares, Juan Avila, and Wele Hernandez–ran the combination backhoes and bobcats on the site. (*Id.* at 78-81.) When Freeman walked by the machines, he told Plaintiff, "[H]ey, get your fucking ass off the machine and pick some concrete or something." (*Id.* at 81.) While Juares, Avila, and Hernandez remained on their machines, Plaintiff joined the mostly Mexican and Mexican-American laborers in shoveling and picking the concrete manually. (Def.'s 56.1(a) ¶ 74.) Plaintiff received operator's wages for both the time he spent operating the machines and the time he spent performing manual labor. (Gonzalez Dep. at 78.)

**Ford Plant Project**

On another occasion, Plaintiff was working on a job at a Ford Plant. (Gonzalez Dep. at 144.) While other workers were using a blowtorch, Plaintiff held a water hose at the ready in the event of a fire. (*Id.* at 145.) Freeman spotted Plaintiff, and according to Plaintiff, told him that nothing would catch fire and directed him to "[g]et on the fucking torch, motherfucker." (*Id.*) Plaintiff asked the foreman to call Brandenburg's Project Manager Dennis McGarel. (*Id.*) Plaintiff claims that he told McGarel that Freeman had used coarse language with him and that, although he did not mind the work, he did not like the way Freeman spoke to him. (*Id.*) According to Plaintiff, McGarel told Plaintiff that he would see if there was something he could do about Freeman. (*Id.*) McGarel denies that this conversation ever took place. (McGarel Decl. ¶ 9.) **Soldier Field Project**

On yet another unspecified date, Plaintiff was assigned to work on a project at Soldier Field. (Gonzalez Dep. at 151.) The project required an operating engineer to use a backhoe to break a section of concrete, wait for the laborers to clean up by hand, and then break another section of concrete. (*Id.*) Plaintiff operated the backhoe, but after he had finished breaking a section of concrete, he would get off the machine and help the laborers sweep. (Def.'s 56.1(a) ¶ 62.) The foreman, Jesse Avila, asked Plaintiff why he kept getting off his machine. (Gonzalez Dep. at 153.) According to Plaintiff, Avila pointed out that the white operating engineer Plaintiff had replaced

simply sat on his machine while the laborers cleaned, and Freeman had not said anything to the white operating engineer. (*Id.*) Plaintiff took Avila's advice, but when Freeman arrived at the work site, Freeman shouted, "Get off the fucking machine and go to fucking work." (*Id.* at 154.) According to Plaintiff, Freeman told Avila to "put the fucking Mexican to work." (*Id.*) Following this confrontation, Plaintiff resumed working with the laborers when he was not operating the backhoe, although he received operator's wages for the entire project. (*Id.* at 154-55.)

**3M and ISG Projects**

Plaintiff described two additional incidents in which he was replaced on a machine by a white operating engineer. On a date Plaintiff only identifies as two to three months before April 20, 2004, Plaintiff was operating the front-end loader at the 3M work site. (Gonzalez Dep. at 225.) According to Plaintiff, Freeman took him off the machine and sent him to work with the laborers so that a white operating engineer who had just arrived on the site could use this machine. (*Id.* at 228.) Plaintiff refused to work with the laborers and was assigned a bobcat the next day. (Def.'s 56.1(a) ¶ 60.)

On another occasion at the ISG work site, Plaintiff recalls that the outside temperature was 40 degrees below freezing. (Gonzalez Dep. at 226.) Plaintiff was operating a machine with heat for two or three weeks, but when a white operating engineer arrived at the work site, the white operator was given Plaintiff's heated machine and Plaintiff was reassigned to an unheated bobcat. (*Id.* at 226.)

**I-294 Project**

Around April 17, 2004, Plaintiff was working in Alsip, Illinois on a Brandenburg work site along I-294. (Def.'s 56.1(a) ¶ 76.) Plaintiff's foremen were both Mexican or Mexican-American: Tony Carbajol and Jesse Avila. (Gonzalez Dep. at 94.) Plaintiff was running the bobcat while another Mexican or Mexican-American operator, Wbaldo Juares, and African American Rodney Brown operated a larger piece of machinery called the 980. (Def.'s 56.1(a) ¶ 77; Gonzalez Dep.

at 94-95.)  According to Plaintiff, a Mexican or Mexican-American laborer operated another piece of equipment.  (Gonzalez Dep. at 225.)  Plaintiff's 12-hour shift began at 7 A.M.  (*Id.* at 96.) Freeman had been at the work site all morning without incident, but at 11 A.M., according to Plaintiff, Freeman confronted Plaintiff and said, "Hey, you motherfucking Mexican.  Get your ass off the machine and go on the shovel."  (*Id.* at 97.)  Freeman, again according to Plaintiff, told Foreman Carbajol, "Put this fucking Mexican to work over there."  (*Id.*)  Plaintiff recalls that Carbajol told Freeman that Plaintiff was working just like everyone else.  (*Id.*)

Andy Youpel, a safety representative from Brandenburg, was also on site, and Plaintiff told him, "Ronnie got a problem with me, and I don't know what the problem is and I need to fix it because he got me tired already.  He be talking to me an asshole, a jagoff, motherfucker every days and I'm tired for that already."  (Def.'s 56.1(a) ¶¶ 47-48.)  Plaintiff told Youpel that the way Freeman spoke to him "bothered" him a lot, and Youpel promised to talk to Freeman.  (Gonzalez Dep. at 98-99.)  Freeman left the site.  (*Id.* at 99.)  Plaintiff does not know whether Youpel ever spoke to Freeman, but when Freeman returned later that day, Freeman instructed Plaintiff to turn off his machine and, according to Plaintiff, said, "[H]ey, you motherfucker.  We was supposed to work Sunday too.  If you want to work tomorrow, I'm going to put you on the fucking shovel all fucking day."  (*Id.*)  Plaintiff refused to shovel and instead told Foreman Carbajol that he was going home early.  (*Id.* at 102.)

On the way home, Plaintiff stopped at the Alsip Police Department to complain about Freeman's treatment of him.  (*Id.*)  The Alsip Police instructed Plaintiff that they could not help him with an employment dispute.  (*Id.*)  On April 19, 2004, Plaintiff sought help at City Hall (presumably of Alsip) and filed a complaint with his union.  (*Id.* at 105.)  Plaintiff and Freeman worked two or three more shifts together, but after about April 21, 2004, Plaintiff testified that he never worked with Freeman again and had no further complaints about Brandenburg.[5]  (Def.'s 56.1(a) ¶¶ 43-44.)

_____

[5]     Plaintiff's time with Brandenburg came to end over a year later. (Gonzalez Dep. at (continued...)

**Freeman's Account**

Freeman's recollection of these events is quite different. When asked if he had ever called Plaintiff a "fucking Mexican," Freeman testified that while he does swear a lot, he would not "pick a person out and say mother fucking Mexican, no" because, in his estimate, 99 percent of the people working for Brandenburg are of Mexican origin. (Def.'s 56.1(a) ¶ 36; Freeman Dep. at 28-30.) According to Freeman, Plaintiff never complained to Freeman about his swearing. (Freeman Dep. at 32-33.) Instead, according to Freeman, when he told Plaintiff to use a blowtorch or perform some other manual task, Plaintiff would say something to the effect that it was not his job. (*Id.* at 36-37.) Freeman recognized that Plaintiff was an operating engineer, but he observed that there was no qualifying examination for that position and that some operators do not in fact know how to run a machine. (*Id.* at 37-38.) Freeman therefore believes that the only difference between a laborer and an operator is a union card. (*Id.* at 38.) Freeman estimated that 90 percent of operators perform all functions at a work site, the exception being operators who are too old to perform manual labor. (*Id.* at 50.) Freeman noted that Brandenburg does not need the operators to run the machines every minute of every shift at a given work site, and explained:

> Instead of laying people off, we make jobs for people instead of giving them time off. So an operator . . . will work doing the labor works if we have no operator work. You want to labor today? If you don't want to do it, go home.

(*Id.* at 63.) Freeman asserted that in so instructing employees, he would often swear, but never swore in a manner intended to put down someone else's national origin. (*Id.* at 64, 80-81.) Furthermore, rough language was, in Freeman's view, part of the work site culture, and Freeman asserted that in his thirty years in the field, he had heard everyone from laborers to foremen and operators to supervisors use similar language. (*Id.* at 71-72.)

---

[5](...continued)
169.) In late May 2005, Brandenburg laid Plaintiff off, and within two weeks Plaintiff's union had found him a position with Walsh Construction where he currently works as an operating engineer. (*Id.* at 14, 112-14, 170-71.)

Freeman testified that he does not believe Brandenburg ever offered him training or distributed materials related to how to deal with a discrimination claim, although he recalled from his orientation that such complaints could be directed to human resources. (*Id.* at 39-40, 72-73.) Freeman also testified that neither McGarel nor Youpel ever spoke with him about Plaintiff's complaints. (Freeman Dep. at 42-43, 48.) McGarel submitted a declaration stating that all supervisors receive Brandenburg's sexual harassment and discrimination policy.[6] (McGarel Decl. ¶ 14.) Further, McGarel noted that Freeman's personnel file contains an acknowledgment of receipt of this policy. (*Id.*)

**Union Contract**

---

[6]     The policy states:

It is the policy of Brandenburg Industrial Service Company to employ qualified persons of the greatest ability without discrimination against any employee or applicant for employment because of race, religion, color, sex, disability, national origin, age status as a disabled veteran or veteran of the Vietnam era, or any other protected group status. I wish to reaffirm and reemphasize that this policy applies throughout the Company and each of its subsidiaries.

To implement this policy, Brandenburg Industrial Service Company has established Affirmative Action Programs by which we undertake that:

1. We will recruit, hire, train and promote qualified persons in all job titles, without regard to race, religion, color, sex, disability, national origin, age, covered veterans' status, or any other protected group status;

2. We will base decisions on employment so as to further the principle of equal opportunity;

3. We will insure that promotion decisions are in accord with principles of equal employment opportunity by imposing only valid requirements for promotional opportunities;

4. We will insure that all personnel actions such as compensation, benefits, layoffs, return from layoff, company-sponsored training, education, and tuition assistance, will be administered without regard to race, religion, color, sex, disability, national origin, age, covered veterans' status or any other protected group status.

Overall responsibility for implementation of this policy is delegated to the Human Resources Administrator, who is hereby designated as the EEO Compliance Officer.

The collective bargaining agreement between Brandenburg and Plaintiff's union provides that under certain circumstances, operation of machines at a Brandenburg work site may be assigned to a laborer rather than to a union-certified machine operator. Section 12 of Article VII reads in relevant part:

> 12.1 The operation of Bobcats and Skidsteer Loaders shall be assigned to Operating Engineers except as otherwise provided herein. Bobcats and Skidsteer Loaders, including those machines equipped with small jackhammers (pencil breakers) may be assigned to Laborers for the following work:
>
> > (a) building demolition work (inside the structure).
> > (b) minor excavation such as curb tear out, replacement and back filing.
> > (c) raising and lowering or movement of manholes.
> > (d) residential concrete work using one bobcat/skidsteer loader. If more than one such machine is used, additional machines shall be assigned to Operating Engineers.
>
> 12.2 Forklifts and bobcats with pallet fork attachments serving eight (8) or more brick masons on commercial projects shall be operated by Operating Engineers. Forklifts and bobcats with pallet attachments serving seven (7) or fewer brick masons on commercial projects may be assigned to Laborers.
>
> 12.3 Drilling operations using air track type machines shall be the jurisdiction of the Laborers. Drills where compressor units do not supply the power in the operation of the drill shall be the jurisdiction of the Operating Engineers. All drills in tunnels are the jurisdiction of the Laborers.

(Heavy and Highway Underground Agreement Districts 1-2-3, International Union of Operating Engineers Local 150 AFL-CIO, (hereinafter, "CBA,") at 30.) Another provision of the collective bargaining agreement, Section 3 of Article IX, explains that a machine operator "regularly assigned to a piece of equipment" "shall be given preference when this piece of equipment is required to work." (*Id.* at 32.) Article III, Section 1 of the collective bargaining agreement imposes some restrictions on Brandenburg's ability to send machine operators home without pay if there is no work for them to do. The agreement requires that Brandenburg notify the union employees the previous evening if no work will be available the following day. (*Id.* at 12.) If the union members are only notified once they have reported for their shift, they receive at least two hours of pay, and if they have already begun working at the time of a call-off, they receive at least eight hours of pay.

(*Id.* at 12-13.)

The contract does also include a general management-rights provision in Article II:

The right to manage and conduct the business, including the right to determine what operations are to be conducted, the methods and means of all operations, to introduce new, improved or changed methods, equipment or facilities, to determine the machinery and equipment to be utilized, the right to hire, promote, manage and direct the work force, to schedule the days, hours, and shifts of operation, to determine when overtime shall be worked, to layoff and recall employees, to curtail or close down any operation, to sell and dispose of all or any part of the Employer's assets, and to contract or subcontract work, except as specifically limited by this Agreement, are reserved solely to the Employer.

(Def.'s 56.1(a) ¶ 23; CBA at 9-10.)  Finally, the collective bargaining agreement includes a prohibition on national origin discrimination and outlines a grievance procedure for perceived violations of the antidiscrimination provision.  (Def.'s 56.1(a) ¶¶ 25-26.)

Plaintiff testified that he has never seen this agreement.  (*Id.* ¶ 21; Gonzalez Dep. at 19.)

## PROCEDURAL HISTORY

On April 19, 2004, Plaintiff filed a charge against Brandenburg with the EEOC.  (Doc. 48.) Plaintiff checked the box pertaining to national origin discrimination and asserted, in the charge narrative, that despite being employed as an operating engineer, he had been "forced to do menial jobs performed by laborers."  (*Id.*)  Plaintiff then filed a complaint in this court on July 9, 2004, alleging violations of Title VII and 42 U.S.C. § 1981, naming only Freeman as Defendant.  (Doc. 1.) When Plaintiff filed an amended complaint on December 17, 2004, naming Brandenburg, he added claims under the Age Discrimination in Employment Act, the Rehabilitation Act, and 42 U.S.C. § 1983.  (Doc. 11.)  The court dismissed these latter three claims following Plaintiff's stipulation to their dismissal on April 15, 2005.  (Docs. 21, 23.)

Defendant now moves for summary judgment on the remaining Title VII and § 1981 claims.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial, *Anderson*, 477 U.S. at 249, and where factual matters are in dispute, to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000).

Defendant seeks summary judgment on Plaintiff's hostile work environment and discrimination claims under Title VII, Plaintiff's 42 U.S.C. § 1981 claim, and on Plaintiff's claim for punitive damages.

**A.      Harassment and Hostile Work Environment**

Plaintiff alleges that Brandenburg created a hostile environment for him on the basis of his Mexican national origin. Defendant moves for summary judgment on this claim, arguing that Plaintiff failed to exhaust administrative remedies, the alleged harassment was neither severe nor pervasive, and there is no basis for corporate liability. The court addresses these arguments in turn.

**1.      Exhaustion of administrative remedies**

Defendant argues, first, that Plaintiff did not present a harassment or hostile environment claim in the charge he filed with EEOC. In general, a court will not hear Title VII claims if the plaintiff did not include those claims in his or her EEOC charge. *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000). Nevertheless, a Title VII plaintiff need not allege every fact and theory in the EEOC charge that forms the basis of his or her complaint. *See Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167-68 (7th Cir. 1976). Rather, claims set out in a Title VII complaint are cognizable even if not first set out in an EEOC charge "if there is a reasonable

relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheeks v. W. & So. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).

Plaintiff checked the box marked "National Origin" on his EEOC charge; the complete narrative reads:

> I was hired by the Respondent [Brandenburg Industrial Service Co.] in July 1983 as a Laborer. I became an Operating Engineer on or about September 8, 2003, and since then I have been forced to do menial jobs performed by laborers.
>
> I believe that I have been discriminated against because of my national origin, Mexican, in violation of Title VII of the Civil Rights Act of 1964 as amended.

Defendant argues that Plaintiff's hostile work environment claim arising out of Freeman's allegedly abusive language should be dismissed because Plaintiff failed to include it in this EEOC charge. (Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment (hereinafter, "Def.'s Mem.") at 5.) Plaintiff counters by asserting that the quoted language above either includes an allegation that Freeman's allegedly abusive language created a hostile work environment or that such a claim is reasonably related to the quoted allegations. (Plaintiff's Memorandum of Law in Support of His Response to Defendant's Motion for Summary Judgment (hereinafter, "Pltf.'s Mem.") at 4.)

The EEOC charge includes no explicit reference to Freeman's allegedly hostile language, and the only explicit claim of wrongdoing refers to Plaintiff's assignment to job tasks below his pay grade. Plaintiff, however, asserts that the sentence "I believe I have been discriminated against because of my national origin, Mexican, in violation of Title VII of the Civil Rights Act of 1964 as amended" is an implicit reference to a hostile work environment claim, or, at least, reasonably related to such a claim. (*Id.* at 4 n.1.) In support of this position, Plaintiff points to this court's decision in *Geist v. Glenkirk*, No. 01-C-700, 2001 WL 1268574 (N.D. Ill. Oct. 23, 2001). (Pltf.'s Mem. at 5.) In that case, after plaintiff, a female director of building and grounds, complained about being paid less than her male counterparts, the employer reassigned to her supervision a

maintenance worker who had previously physically intimidated and stalked her. 2001 WL 1268574, at *1. In her charge of discrimination, Geist asserted:

> Beginning in May, 2000 I complained to management about [disparate] pay. Management subsequently placed a co-worker back under my supervision who had previously been removed from my department because he was physically intimidating. . . . I believe I was retaliated against and discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended, and in violation of the Equal Pay Act.

*Id.* at 2. When Geist later filed a complaint in federal court alleging both sex discrimination and sexual harassment, the employer moved to dismiss the harassment claim as beyond the scope of the EEOC charge. *Id.* at *2, 4. The *Geist* court denied this motion, observing that sexual harassment is reasonably related to plaintiff's allegation in the EEOC charge that "management placed a co-worker back under her supervision who had been removed because he was 'physically intimidating.'" *Id.* at *5.

As Plaintiff admits, the EEOC charge at issue here is less specific than that in *Geist*. (Pltf.'s Mem. at 6.) Unlike Geist, whose charge made reference to a "physically intimidating" co-worker, Plaintiff here made no mention of any intimidation or harassment, nor did he complain of discriminatory conduct of any kind beyond job assignment. That said, even without an explicit or implicit reference to intimidation or harassment, the court believes that an EEOC investigation of the discriminatory job assignment claim would have uncovered Freeman's allegedly abusive language. In Plaintiff's version of events, in addition to simply calling Plaintiff racially-charged names out of the earshot of others, Freeman used racially abusive language when he directed Brandenburg foremen to give Plaintiff particular job assignments. The court concludes that an EEOC investigator's investigation of the job assignments claim would have resulted in discovery of the additional allegations in Plaintiff's complaint and declines to dismiss the hostile environment claim on this basis.

## 2. Severe or pervasive

Defendant's second argument is that the harassment Plaintiff experienced was neither

severe nor pervasive enough to create an objectively hostile work environment. *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). Defendant correctly cites a number of cases for the proposition that employees must tolerate a certain amount of colorful language before recourse to the federal courts. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); s*ee also Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) ("Title VII does not prohibit all verbal . . . harassment in the workplace."); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("[Title VII] is not designed to purge the workplace of vulgarity.").

A jury might well decide in favor of Brandenburg on this issue, but Plaintiff has testified that his superintendent used racially-charged and expletive-laden invectives on a nearly daily basis. On summary judgment, the court is not free to assess the credibility of that testimony, which establishes a material dispute as to the severity or pervasiveness of the alleged harassment. *See Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950-51 (7th Cir. 2005) (relentless pattern of less severe harassment that extends over long period of time violates the law). In *Guzman v. Abbott Labs.*, the court denied an employer's motion for summary judgment on its employee's hostile work environment claim where supervisors made derogatory comments about the employees Mexican ancestry on a daily basis and spoke generally of the need for all "damn Hispanics" to learn English. 59 F. Supp. 2d 747, 753, 762 (N.D. Ill. 1999). Plaintiff's allegations here are at least as severe.[7]

---

[7] Defendant attempts to cast doubts on the truthfulness of Plaintiff's deposition testimony by juxtaposing Plaintiff's claim that Freeman used racially derogatory language on nearly every shift they worked together, (Gonzalez Dep. at 58-59), with Plaintiff's later statement that he and Freeman "don't talk to each other too much," (*Id.* at 174). (Def.'s Mem. at 7.) Plaintiff's testimony suggests, however, that he may recognize a distinction between "conversation" and "talk":

| | |
|---|---|
| Plaintiff: | Me and Freeman we don't have any conversations any day. He just talk to me like that. And I stay quiet and don't say nothing back. |
| Mr. Lies: | Okay. On how many occasions did he come out there and use language toward you that you didn't think was appropriate like the F-word? |
| Plaintiff: | Every day I was working with him. |

(Gonzalez Dep. at 91.)

### 3. Basis for corporate liability

Finally, Defendant argues that Brandenburg is not liable for the acts of its supervisors unless the harassment culminated in a tangible employment action. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). If Plaintiff cannot do so, Defendant may raise the affirmative defense that Plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by [Defendant] or to avoid harm otherwise." *Id.* at 807-08.

For purposes of this defense, the court need not determine whether Plaintiff suffered a tangible employment action. Even if there is no such action in this case, there are disputes of fact about whether Plaintiff's failure to file a grievance is sufficient to establish the *Faragher/Ellerth* defense. Defendant correctly observes that an employer "must have notice or knowledge of the harassment before it can be held liable," and that "for a plaintiff to survive summary judgment, she must show she provided the employer with enough information so that a reasonable employer would think there was some probability that she was being . . . harassed." *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003). Although Plaintiff did not specifically notify McGarel or Youpal that he was called a "fucking Mexican," Plaintiff did notify both Brandenburg officials that he found Freeman's language generally abusive. *See Cerros*, 398 F.3d at 952 (relevant inquiry is whether employee alerted her employer to harassment, not whether she followed the letter of the prescribed reporting procedures). Furthermore, there is evidence in the record that the Brandenburg foremen who received Freeman's racially-charged orders were aware of the fact that Freeman made disparaging commentary on Plaintiff's national origin.

### B. Discrimination Claim

In addition to his hostile environment claim, Plaintiff has alleged that Defendant impermissibly considered his national origin in assigning him menial tasks. A plaintiff can prove intentional employment discrimination by the direct method by offering direct evidence or circumstantial evidence of his employer's intent. *Velez*, 442 F.3d at 1049. Alternatively, where a

plaintiff has no direct or circumstantial evidence of discrimination, he may avail himself of the burden-shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *Velez,* 442 F.3d at 1049. Under that rubric, Plaintiff establishes a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered a materially adverse employment action; and (4) Brandenburg treated similarly situated employees outside of the protected class more favorably. *Id.* at 1049-50. If Plaintiff presents such evidence, Defendant may present evidence of a legitimate, non-discriminatory reason for its job assignment decisions. *Id.* at 1050. If Defendant does so, Plaintiff bears the burden of proving that this proffered reason is pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 804.

### 1.  Adverse employment action

It is undisputed that Plaintiff, a Mexican-American, is a member of a protected class. He testified that he received less favorable assignments than similarly-situated, white operating engineers at Soldier Field, 3M, and ISG projects.[8]

Defendant argues that because it is undisputed that Plaintiff at all times received an operating engineer's wage and often operated on-site machinery, these periodic and temporary reassignment did not amount to an actionable adverse employment action. (Def.'s Mem. at 9-10.) In support of this position, Defendant cites a number of cases observing that

> [a]dverse actions must be more than a "mere inconvenience or an alteration of job responsibilities." A "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." However, "not everything that makes an employee unhappy is an actionable adverse action."

*Johnson-Carter v. B.D.O. Seidman, LLP*, 169 F. Supp. 2d 924, 938 (N.D. Ill. 2001) (quoting *Oest v.*

---

[8]  The record shows that Mexican and Mexican- American operating engineers and laborers remained assigned to machine operation when Plaintiff was reassigned to manual labor at the Asbestos Removal Projects as well as at the Whiting, Indiana; O'Hare; and I-294 work sites.

*Ill. Dep't of Corrections*, 240 F.3d 605, 612-13 (7th Cir. 2001)); s*ee also Leibforth v. Belvidere Nat'l Bank*, No. 99-C-50381, 2002 WL 1760220, at *2 (N.D. Ill. July 30, 2002), *aff'd*, 337 F.3d 931, 933 (7th Cir. 2003) (affirming lower court's finding that plaintiff could not prove pretext); *Brown v. Ameritech*, No. 95-3914, 1997 WL 43224, at *8 (N.D. Ill. Jan. 27, 1997), *aff'd*, 128 F.3d 605, 607 (7th Cir. 1997) (same).

This is a correct, but only partial, statement of the law. In *Tart v. Ill. Power Co.*, the Seventh Circuit recounted that there are three categories of cases in which the criteria for a materially adverse employment action is met:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."

366 F.3d 461, 475 (7th Cir. 2004) (quoting *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (emphasis in original)).[9] Construing the facts in the light most favorable to Plaintiff, the court concludes that his reassignment from a heated piece of a equipment to an unheated piece of equipment, from a machine into an asbestos-filled basement, or from a machine operation assignment to a job that requires swinging picks and hoisting shovels, may constitute adverse action within the meaning of Title VII. *Cf. Tart*, 366 F.3d at 475-76 (reversing a lower court finding that a reassignment from a utility truck to digging utility trenches was a lateral transfer).

Furthermore, the CBA indicates that operating engineers received wage bonuses for

---

[9] Due to differences in the statutory language, a retaliation claim imposes a less rigorous test. *Burlington No. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2409 (2006). The anti-retaliation provision prohibits any materially adverse action which would dissuade a reasonable employee from making or supporting a charge of discrimination whether the action is employment-related or not.

operating machinery under conditions that likely required greater technical skill. (CBA at 27-28 (requiring an hourly wage premium for longer cranes and machines operated in tunnels or underground).) An operating engineer who is never assigned to operate machinery is unlikely to develop the skills necessary to be eligible for these premium assignments. The court concludes that there are disputes of fact on the issue of whether Plaintiff's work assignments constitute adverse employment action.

### 2. Proof of Discrimination

In addition to proving that he suffered adverse action, Plaintiff must show that the action was motivated by his national origin. Both parties have addressed the matter of whether Plaintiff can establish that the non-discriminatory justification for Plaintiff's reassignment offered by Defendant is pretextual. *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 433 (7th Cir. 2005). Defendant justifies Plaintiff's assignments by observing that, "operators, like Plaintiff, operate machines and perform work as necessary." (Def.'s Mem. at 11.) In fact, Freeman's testimony is that the assignment to manual labor for operating engineers when no machine was available was a benefit because the alternative was being sent home without pay.

Defendant supports these assertions with reference to the "management rights" clause found at Article II of the CBA. (Defendant's Reply Memorandum of Law in Support of Its Motion for Summary Judgment (hereinafter, "Def.'s Reply") at 12.) Plaintiff contests the sincerity of this justification, noting other provisions of the union contract that constrain Defendant's right to make certain work assignments and send operating engineers home without pay even when suitable job assignments are unavailable. (Pltf.'s Mem. at 19-20.) For instance, Art. VIII, § 12 curtails Defendant's ability to assign a laborer to operate a bobcat, skidsteer loader, or forklift. And, contrary to Freeman's testimony, the CBA in Article III provides that a machine operator who has already begun working on his shift and is then informed that no further tasks at the work site require machine operation is entitled to a full day's pay even in the absence of a reassignment to manual

labor.

If Freeman genuinely believed he was assigning Plaintiff to manual labor for a legitimate reason, his misunderstanding about the CBA provisions would not be sufficient to establish pretext. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground.") The court believes, however, that this case does not require the burden-shifting/pretext analysis on which the parties have focused. The overwhelming majority of Brandenburg's employees were Mexican or Mexican-American, and it appears to the court that a least a substantial percentage of Brandenburg's machine operators were, as well. It would be difficult, in this context, to establish national origin discrimination via the burden-shifting method alone. As described earlier, though, Plaintiff testified that in ordering Plaintiff to perform the work of a laborer, Mr. Freeman used vulgar language and insulting references to his national origin. Such epithets may constitute circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (citing *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003); *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 444 (7th Cir. 1997)). The remarks involved here were made by the decision maker (Freeman), contemporaneously with the decisions to assign Plaintiff to undesired work. The court concludes there is sufficient circumstantial evidence of an unlawful motivation, and denies summary judgment on this basis.

## C.     42 U.S.C. § 1981

As the Seventh Circuit explained in *Bennett v. Roberts,* the same standard of liability governs both claims under Title VII and under 42 U.S.C. § 1981. 295 F.3d 687, 697-98 (7th Cir. 2002). Section 1981 is limited to claims of racial discrimination, but race is construed broadly to

include persons of ancestry or ethnicity considered non-white in 1866, when Congress adopted § 1981. *Pourghoraishi v. Flying J., Inc.*, 449 F.3d 751, 756-57 (7th Cir. 2006). Although the Seventh Circuit has yet to address the question of whether persons of Mexican descent constitute a race for the purpose of § 1981, other courts have concluded they do, *see e.g.*, *Cardenas v. Aramark Facility Servs., Inc.*, No. 05-6462, 2006 WL 1344057, *2 (N.D. Ill. May 11, 2006) (Hart, J.) (citing *Aramburu v. Boeing Co.*, 112 F.3d 1379, 1387 n.10 (10th Cir. 1997)), and this court follows suit.

For the reasons explained with respect to Plaintiff's Title VII claims, Defendant's motion for summary judgment on Plaintiff's § 1981 claim is denied.

**D.    Punitive Damages**

Title VII authorizes punitive damages when a plaintiff demonstrates that the defendant discriminated "with malice or reckless indifference to the federally protected rights of the aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Ass'n*, the Supreme Court set out three requirements for the recovery of punitive damages from an employer: plaintiff must establish that (1) the employee or employees who discriminated acted with knowledge that its actions could violate federal law; (2) the employee or employees who discriminated are managerial agents of the employer acting with the scope of their employment; and (3) the employer cannot show that it engaged in a good faith effort to implement an antidiscrimination policy. 527 U.S. 526, 539-43 (1999).

McGarel's declaration stating that the Brandenburg policy against harassment was disseminated to all of the Defendant's supervisors creates a dispute of fact concerning Freeman's awareness of the federal law prohibiting race-based harassment.[10] In Defendant's view, the existence and dissemination of this antidiscrimination policy militates against a finding of bad faith

---

[10]    There is evidence in the record to indicate that Freeman and other supervising foreman were managerial agents of Defendant acting within the scope of their duties. Defendant has not challenged Plaintiff's ability to pursue punitive damages on this ground.

sufficient to support an award of punitive damages. (Def.'s Mem. at 13.) Defendant notes that Plaintiff received this antidiscrimination policy as well as instructions on how to initiate a grievance pursuant to the collective bargaining agreement, which he did not read. (*Id.*)

Defendant is correct that implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith in compliance with Title VII, but the existence of such a policy is not sufficient by itself to insulate the employer against an award of punitive damages. *Lampley v. Onyx Acceptance Corp.,* 340 F.3d 478, 482-83 (7th Cir. 2003); *Bruso v. United Airlines*, 239 F.3d 848, 858 (7th Cir. 2001). The *Bruso* court upheld a jury's award of punitive damages in spite of the *Bruso* defendant's written antidiscrimination policy because the *Bruso* plaintiff introduced evidence that defendant's management ignored this policy by failing to remedy known violations. 239 F.3d at 861.

Here, although it is undisputed that Plaintiff did not file a formal grievance, the record contains some evidence that Plaintiff complained to both McGarel and Youpal about Freeman's use of offensive language. The record also contains Freeman's testimony that neither McGarel nor Youpal ever spoke with Freeman about this issue. Again, a jury may well conclude an award of punitive damages is not supported here, but the court declines to enter summary judgment on this issue.

## CONCLUSION

Defendant's motion for summary judgment (44) is denied. The court notes that it is undisputed that Plaintiff suffered no financial loss as a result of his occasional assignments to work as a laborer rather than a machine operator. For reasons unrelated to the alleged hostile environment, he no longer works for Brandenburg, and his damages arising from the alleged harassment may be modest. The parties are encouraged to attempt to settle this dispute.

ENTER:



22

September 29, 2006

_____

REBECCA R. PALLMEYER
United States District Judge